IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 17, 2015 Session

**STATE OF TENNESSEE v. JOSHUA JOHNSON**

**Appeal from the Criminal Court for Knox County**
**No. 102466B      Steven Wayne Sword, Judge**

_____

**No. E2015-00545-CCA-R3-CD – Filed January 25, 2016**

_____

Appellant, Joshua Johnson, stands convicted of facilitation of attempted first degree murder, employing a firearm during the attempted commission of a dangerous felony with a prior dangerous felony conviction, unlawful possession of a weapon, and aggravated assault.  He received an effective sentence of twenty-six years.  On appeal, appellant argues that the evidence was insufficient to support his convictions, that he should not have been convicted and sentenced under Tennessee Code Annotated section 39-17-1324 when he was not convicted of any of the listed dangerous felonies, and that the trial court should have granted his request for an absent material witness jury instruction.  Following our careful review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed;**
**Case Remanded**

ROGER A. PAGE, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ROBERT H. MONTGOMERY, JR., JJ., joined.

Leslie M. Jeffress, Knoxville, Tennessee, for the Appellant, Joshua Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Charme P. Allen, District Attorney General; and Ta Kisha Monette Fitzgerald, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

This case concerns the August 10, 2013 shooting of Nathan Kelso. The victim survived the shooting, and appellant and codefendant Bendale Romero were charged with attempted first degree murder (two counts representing alternate theories), employing a firearm during the commission of a dangerous felony, and aggravated assault (two counts representing alternate theories). Appellant (but not his codefendant) was also charged with employing a firearm during the commission of a dangerous felony with a prior conviction for a dangerous felony and with the unlawful possession of a weapon. Appellant and codefendant Romero were tried jointly in September 2014.

## I. Facts

The State's first witness was Michael Alan Mays. Mr. Mays testified that he was the records manager for the Knox County Emergency Communications District (9-1-1). Mr. Mays said that the first 9-1-1 call regarding the shooting of the victim occurred at 1:05 a.m. on August 10, 2013. The State played five 9-1-1 calls for the jury, which we have summarized as follows:

(1) A woman reported hearing seven gunshots in Lonsdale Homes.

(2) A woman reported hearing gunshots for fifteen minutes in a parking lot in Lonsdale Homes. She saw a black car and said that she did not want to look out her door.

(3) A woman reported hearing a lot of gunshots and a man begging for his life. She believed it happened in parking lot C.

(4) A man reported hearing ten to fifteen gunshots and believed someone was shot. He reported that the shooting occurred at Pascall and Minnesota in Lonsdale. He saw people running.

(5) A man reported that someone had been shot behind Minnesota Avenue. He reported that the shooter was a short, light-skinned black man who drove a maroon vehicle.

The State's next witness was Henry Wilson. Mr. Wilson explained that he lived in Lonsdale Homes and showed, on an aerial map, where his home was in relation to parking lot C. Mr. Wilson testified that on August 10, 2013, just as he was lying down to go to sleep, he heard two gunshots followed by someone "hollering, moaning and groaning." He further testified that the person said, "[D]on't do this to me," and "[Y]ou know me." Then, he heard two more shots. Mr. Wilson said that he looked outside and saw someone drive away, but without his glasses on, he was unable to recognize the

person. Mr. Wilson went outside to the victim, who was near the trash cans in parking lot C, and saw that the victim was wounded in his legs and head. Mr. Wilson testified that the other bystanders told him who had shot the victim. When police officers arrived, Mr. Wilson told them that "Little B" was the shooter and told them where "Little B" was located. Mr. Wilson identified "Little B" as Bendale Romero.

Michael L. Tillery testified that on August 10, 2013, he was in bed asleep when he heard arguing outside his home in Lonsdale Homes. He looked out the window but could not see well without his glasses. When he turned to get his glasses, he heard gunshots. He saw someone drive away. Mr. Tillery said that he called 9-1-1 and also spoke with police officers who arrived thereafter.

On cross-examination, Mr. Tillery said that he heard the victim say, "'[M]an, we're better people than that[.]'" Mr. Tillery denied telling police that the shots were fired from the car and stated that he did not remember telling police that "Little B" was the person who said, "'[W]e're better people than that.'" He said that the shots were spaced apart—first two and then a third. Mr. Tillery also stated that the car that drove away was red and that the victim had been arguing with someone in the red car.

Knoxville Police Department Officer Jacob Wilson testified that he patrolled the area in and around Lonsdale Homes. He was dispatched to Lonsdale Homes on August 10, 2013, after residents had reported shots being fired. When Officer Wilson arrived in lot C, he heard someone yelling for help on the other side of the parking lot. He ran to the victim and saw that the victim had been shot in his temple. Officer Wilson said that the victim was grabbing his pants leg and calling for someone to help him. Officer Wilson testified that despite his knowing the victim personally, he could not recognize the victim due to the victim's injuries. Officer Wilson had a conversation with the victim before the victim went to the hospital. He also talked with bystanders. As a result, he went to the apartment where he believed codefendant Romero lived. Codefendant Romero's mother allowed Officer Wilson into the apartment and showed him to Romero's bedroom. Romero's window was open and wet grass was scattered on his bed. Officer Wilson learned that the shooting suspect was supposedly driving a maroon two-door car, and a car matching that description was found in a yard nearby, "pulled in . . . like it was hidden."

On cross-examination, Officer Wilson testified that Michael Tillery told him that he heard two shots, went to his window or door, and observed a "vehicle move closer to [the victim]." Mr. Tillery also told Officer Wilson "that he heard [the victim] plead for his life, or . . . , please don't shoot me again, and they said, man, we're better people than that[,] and then shot again." Officer Wilson said that Mr. Tillery attributed the shooter's statement to "Little B."

The victim, Nathan Kelso, testified that he was from Knoxville and grew up in the Lonsdale area. When asked whether he recognized anyone at the defense table, he said that the person who shot him was the person wearing a yellow button-up shirt and that he also recognized the person wearing black pants and a white button-up shirt as being from Lonsdale. The person with the yellow shirt was identified for the record as codefendant Romero, and the person wearing the white shirt was identified for the record as appellant. The victim testified that on August 10, 2013, he purchased marijuana and went to Lonsdale with a friend whose name he could not remember to trade the marijuana and a small amount of cash for crack cocaine. When he arrived at Lonsdale, he saw that "the boy Josh had a gun out on two other fellows." The victim said that after that situation was resolved, he approached "him," presumably "Josh," and asked "if he would trade off on something that I had." The victim testified, "[H]e turned around and said, f*** that, pow, shot me in my leg for no reason." The victim said that he asked him what he was doing and "what the f*** is wrong with you," but when the victim tried "to swing" his arm, the man "shot [him] in [his] arm." The victim then stated

> After he shot me in my arm, I went over to the other side to the ground. When I got to the ground, I never seen the other little guy all the time I was out there. And I heard Josh myself, come on, man, shoot him in the head, shoot him in the head. I remember him saying, shoot me in the head. He put the gun to my forehead, it didn't go off. So he pushed me back to the ground, fixed the gun, and I put my hand up when it went to my (sic) gun, he shot me in my head.

The victim identified the man in the yellow shirt (codefendant Romero) as the person who shot him in the head. The victim said that he had known "Josh" since Josh was a baby and that he had known of the man in the yellow shirt since he was young, as well. The victim showed the places where he had been shot, and he explained that the bullet that hit his head first went through his hand and was still lodged behind his eye. He said that the men got into a Camero driven by the man in the yellow shirt. The victim explained that he was unable to remember names.

Regarding the effect that the shooting had on his body, the victim testified as follows:

> I can't remember certain foods . . . the name of them. I've gotta look at it again and then I can remember what it is. Still, names − you know, people I know if I see − when I see them − I see people I know who they are. I just can't remember names. There's just things I can't do like I used to do − working status and stuff like that . . . . I can't hear in my left ear[.] . . . My eyesight, I've just gotta . . . keep it dripped to where it stays watered

down, you know, wet. I can't chew on my left side, my food. . . . I have a ringing in my ear. . . . My ringing lasts forever. . . .

The victim identified a photographic lineup and recalled that the lineup was given to him when he was in the hospital. It was dated August 17, 2013, and he had circled the photograph of the man who shot him in the head. He again identified the man in the courtroom wearing a yellow shirt as the man who shot him in the head. The victim identified a second photographic lineup that was shown to him in the hospital. He said that the person he circled was the man who shot him in the leg and arm. The second photographic lineup was dated August 18, 2013. The victim testified that the man in the courtroom wearing glasses was the person who shot him in the leg and arm. The State identified that person for the record as appellant.

On cross-examination, the victim testified that he had $60 in cash and $50 worth of marijuana when he approached appellant. He agreed that he knew appellant had a firearm. The victim denied that he was trying to steal appellant's drugs. He affirmed that the person who walked to Lonsdale with him would have been present for at least the first gunshot. The victim agreed that appellant could have killed him and stated, "He talked someone into killing me because I (inaudible)." On re-direct examination, the victim confirmed that he told the police on August 17 and August 18 that there were two shooters and that he testified at the preliminary hearing that there were two shooters.

Lisa Knight, the director of the handgun program with the Tennessee Department of Safety and Homeland Security, testified that codefendant Romero did not have a handgun carrying permit and that it would be illegal for a person with a felony drug conviction to possess a handgun.

The State presented evidence from medical personnel at the University of Tennessee Medical Center regarding the victim's medical treatment and records. Thereafter, the State rested its case-in-chief.

Codefendant Romero testified in his own defense. He stated that on the night of the shooting, the victim approached him in parking lot C about "sell[ing] him some." Codefendant Romero said that he did not sell him anything but continued on his way to throw out his trash in the parking lot dumpster. When he returned from the dumpster, the victim "tried to strong arm [him] and go in [his] pockets." Codefendant Romero stated that he and the victim struggled, and Romero's gun fell off of his hip. He said, "[S]o when I finally shook him off of me and got free from him, I dive, and when I got to the gun, I just was scared, and I pointed it at him and started squeezing." Codefendant Romero then ran to his car while shooting back at the victim, got into his car, and drove behind his apartment. He said that he threw away the gun in a creek at a park. Codefendant Romero said that he had a previous encounter with the victim one to two

-5-

weeks before the shooting during which the victim tried to "bully[]" him for money. He stated that he was not trying to kill the victim.

On cross-examination by appellant's attorney, codefendant Romero testified that appellant was not present during the shooting. Codefendant Romero then rested his case-in-chief, and appellant rested his case without presenting evidence.

Subsequently, the jury convicted codefendant Romero as charged and convicted appellant of two counts of the lesser-included offense of facilitation of attempted first degree murder; two counts of employing of a firearm during the attempted commission of a dangerous felony with a prior dangerous felony conviction[1]; one count of unlawful possession of a weapon; and two counts of aggravated assault. The trial court merged the alternate theory convictions and sentenced appellant to sixteen years as a Range II, multiple offender for the facilitation of attempted first degree murder conviction; to the statutory minimum ten-year term at 100% for the employment of a firearm conviction; to eight years as a Range II, multiple offender for the unlawful possession of a weapon conviction; and to eight years as a Range II, multiple offender for the aggravated assault conviction. The trial court ordered that appellant's employment of a firearm conviction be served consecutively to appellant's sentence for facilitation of attempted first degree murder. The trial court ordered appellant's other sentences to be aligned concurrently. Therefore, appellant's aggregate sentence length was twenty-six years. Appellant now appeals the judgments of the trial court.

## II. Analysis

### A. Sufficiency of the Evidence (Appellant's Issues 1-3)

Appellant contests the sufficiency of the evidence supporting his convictions.[2] First, he contends that his convictions should not rest on the credibility of the victim, who suffered mental deficits as a result of the shooting. Second, he maintains that the trial court should have dismissed his employing a firearm during the commission of a dangerous felony conviction because he was not convicted of a dangerous felony listed in Tennessee Code Annotated section 39-17-1324(i). To the extent that the third issue listed in his brief—whether the trial court should have sentenced him pursuant to Tennessee Code Annotated section 39-17-1324—amounts to a challenge of the sufficiency of the evidence supporting this conviction, we will address it in this section.

---

[1] The weapon charges were bifurcated from the other charges because the jury also had to determine that appellant had a prior dangerous felony.

[2] Appellant's second issue was whether the trial court should have granted appellant's motion for judgment of acquittal, an issue which is analyzed under the same standard as his first issue, sufficiency of the evidence supporting his convictions.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

Appellant was convicted of facilitation of attempted first degree premeditated murder, employing a firearm during the attempted commission of a dangerous felony with a prior dangerous felony conviction, unlawful possession of a firearm, and aggravated assault. In order to support appellant's conviction for facilitation of attempted first degree murder, the State had to prove beyond a reasonable doubt that "the accused (a) knew another person was going to commit a specified felony and (b) knowingly furnished substantial assistance in the commission of the felony although the accused did not possess the requisite intent to be guilty of the felony." *State v. Parker*, 932 S.W.2d 945, 950-51 (Tenn. Crim. App. 1996); *see also* Tenn. Code Ann. 39-11-403(a). Appellant was convicted of facilitating attempted first degree murder under the theory of

premeditation, for which the State would have had to show that the main actor "[a]cted with intent to cause a result that is an element of the offense, and believe[d] the conduct [would] cause the result without further conduct on the person's part" and that "the intent to kill [was] formed prior to the act itself." *See* Tenn. Code Ann. § 39-13-202(d).

To support appellant's other convictions, the State had to show that appellant employed a firearm during the commission of a dangerous felony and that he had a prior conviction for a dangerous felony; that appellant possessed a firearm after having been convicted previously of a felony drug offense; and that appellant either knowingly caused serious bodily injury to the victim or that he caused bodily injury to the victim while using a deadly weapon. *See* Tenn. Code Ann. §§ 39-13-101, -102, 39-17-1307(b)(1)(B), -1324(b)(2).

Viewed in the light most favorable to the State, the proof at trial showed that appellant shot the victim in the arm and the leg and encouraged codefendant Romero to shoot the victim in the head, which codefendant Romero then did. Appellant stipulated during the trial that he had a prior felony drug conviction. Appellant argues that because the victim was the only witness to place appellant at the scene and due to the victim's mental deficits that occurred as a result of the shooting, the evidence was insufficient to support his convictions. We disagree. The victim's testimony was clear about what happened to him and who was responsible. He identified appellant soon after the shooting and again in court. Moreover, the jury heard the evidence and was able to gauge the victim's credibility.

These facts are sufficient to sustain appellant's convictions for facilitation of attempted first degree premeditated murder, unlawful possession of a firearm, and aggravated assault. However, further analysis is required for appellant's employing a firearm during the commission of a dangerous felony conviction. He argues that because he was not convicted of a dangerous felony listed in section 39-17-1324(i), he cannot then be convicted of employing a firearm during the commission of a dangerous felony.

The jury in this case specifically found that appellant was guilty of employing a firearm during the commission of a dangerous felony and that the specific dangerous felony was attempted first degree murder, despite having convicted him of the lesser-included offense of facilitation of attempted first degree murder; thus, the verdicts are seemingly inconsistent. Nonetheless, Tennessee courts have long held that inconsistent verdicts are allowed:

> Consistency in verdicts for multiple count indictments is unnecessary as each count is a separate indictment. . . . An acquittal on one count cannot be considered res judicata to another count even though both counts stem from the same criminal transaction. This Court will not upset a seemingly

inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned.

*Wiggins v. State*, 498 S.W.2d 92, 93-94 (Tenn. 1973). More recently, the Tennessee Supreme Court stated "that '[t]he validity accorded to [inconsistent] verdicts recognizes the sanctity of the jury's deliberations and the strong policy against probing into its logic or reasoning, which would open the door to interminable speculation.'" *State v. Davis*, 466 S.W.3d 49, 77 (Tenn. 2015) (quoting *United States v. Zane*, 495 F.2d 683, 690 (2nd Cir. 1974)). The facts cited in support of appellant's other convictions equally support his conviction for this offense. Therefore, we affirm appellant's convictions.

## B. Sentencing

The crux of appellant's issue regarding his employing a firearm during the commission of a dangerous felony conviction was whether the evidence was legally sufficient to support his conviction, but because he raised the issue as a sentencing consideration, we will analyze whether the trial court properly sentenced appellant for this conviction. Appellant contends that the trial court erred by sentencing him under Tennessee Code Annotated section 39-17-1324.

To begin, Tennessee Code Annotated section 39-17-1324(h)(2) sets the mandatory minimum for appellant's conviction at ten years. Thus, the trial court properly sentenced appellant to a sentence length of ten years. Tennessee Code Annotated section 40-35-501(j) states that there shall be no release eligibility for a conviction under section 39-17-1324(b). Thus, the trial court's sentencing is proper in that regard.[3] Concerning the sentence alignment, section 39-17-1324(e) mandates that a sentence imposed for a violation of subsection 1324(b) be served consecutively "to any other sentence the person is serving at the time of the offense or is sentenced to serve for conviction of the underlying dangerous felony." The trial court therefore properly aligned appellant's sentence consecutively to a sentence for a prior case under this provision. The trial court also aligned appellant's sentence consecutively to his sentence for facilitation of attempted first degree murder but did so under the provisions of Tennessee Code Annotated section 40-35-115(b).

Prior to 2013, on appellate review of sentence alignment issues, courts employed the abuse of discretion standard of review. *See State v. Hastings*, 25 S.W.3d 178, 181 (Tenn. Crim. App. 1999). Our supreme court has since extended the standard of review

---

[3] However, the trial court should have indicated the 100% release eligibility by marking the box next to "§ 39-17-1324(a), (b) 100%" rather than "40-35-501(i) 100%." We therefore remand the case for correction of this clerical error.

enunciated in *State v. Bise*, abuse of discretion with a presumption of reasonableness, to consecutive sentencing determinations. *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013); *Bise*, 380 S.W.3d 682, 707 (Tenn. 2012) (modifying standard of review of within-range sentences to abuse of discretion with a presumption of reasonableness); *see also State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying abuse of discretion with a presumption of reasonableness to review of alternative sentencing determinations by the trial court). Thus, the presumption of reasonableness gives "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b) . . . ." *Pollard*, 432 S.W.3d at 861.

The procedure used by the trial courts in deciding sentence alignment is governed by Tennessee Code Annotated section 40-35-115, which lists the factors that are relevant to a trial court's sentencing decision. Imposition of consecutive sentences must be "justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102(1). The length of the resulting consecutive sentence must be "no greater than that deserved for the offense committed." *Id.* § 40-35-103(2). The court may order consecutive sentences if it finds by a preponderance of the evidence that one or more of the following seven statutory criteria exists:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the

victim or victims;

(6)     The defendant is sentenced for an offense committed while on probation; or

(7)     The defendant is sentenced for criminal contempt.

The *Pollard* court reiterated that "[a]ny one of these grounds is a sufficient basis for the imposition of consecutive sentences." *Pollard*, 432 S.W.3d at 862 (citing *State v. Dickson*, 413 S.W.3d 735, 748 (Tenn. 2013)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.*

The trial court in this case made the following findings with regard to consecutive sentencing:

There's also some discretionary consecutive sentencing the Court should consider within this new case that we're sentencing him for today. And the State has asked that the Court consider that the defendant is a professional criminal who has knowingly devoted such life to criminal acts as a major source of livelihood. There is some evidence in this case concerning drug transactions and the history of that, but I don't think there's sufficient evidence to find that the defendant has devoted his life to criminal acts as a major source of livelihood. And so, I don't think that that mandates consecutive sentencing or can be relied upon in discretionary consecutive sentencing.

The defendant is an offender whose record of criminal activity is extensive. The Court does find that that is true in this case. Mr. Johnson has a significant juvenile history including the conviction for felony murder, and I think that the Court can consider that prior conviction, both to increase his range here to range two, as well as in the determination on whether or not there should be consecutive sentencing in this case. Mr. Johnson is an individual who participated in the murder of a person in the past and except for the grace of God and modern medical science, this isn't a first degree murder in this case. And so, I think -- I think, looking back at Mr. Johnson's history, that it certainly is reasonable for the Court to find that the defendant is – does have a criminal history that is extensive, and that does support consecutive sentencing in this case.

-11-

The State also argues that the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. And the Court finds that the circumstances surround the commission of this particular offense are aggravated. This wasn't just your normal attempted first degree murder. This was a situation where Mr. Johnson shot Mr. Kelso for no reason. He wasn't threatened by Mr. Kelso, he just pulled out a gun and shot him multiple times and then encouraged his co-defendant to put the [coup de grâce] into his head and while this person is sitting there begging for his life. So I find that those are aggravating circumstances.

I think confinement for an extended period of time is also necessary to protect society from Mr. Johnson's further criminal conduct. Juvenile Court attempted all they could to rehabilitate Mr. Johnson[;] he didn't take advantage of that. He has, as I stated, participated in the commission of a homicide of a person in the part, and almost was successful again in doing that. Mr. Johnson has shown himself to be a danger to the community. And when TDOC released him to the community after completion of the boot camp program, they obviously put this community in danger as evidenced by the lifelong injuries Mr. Kelso suffered at the hands of Mr. Johnson and his co-defendant. And so, restraining Mr. Johnson as long as possible is necessary to protect this community.

The trial court also determined that the aggregate sentence length was reasonably related to the offense for which appellant was convicted. In doing so, the trial court determined that running all sentences consecutively would be excessive and determined that only the employing a firearm during the commission of a dangerous felony sentence would be served consecutively. From the trial court's findings and our review of the record, we conclude that the trial court's findings are supported by the record and that it did not abuse its discretion in sentencing appellant.

C. Absent Material Witness Jury Instruction

Appellant has waived his final issue—that the trial court should have granted his request for an absent material witness jury instruction—for failure to comply with Tennessee Rule of Appellate Procedure 27 regarding the content of briefs. *See* Tenn. Ct. Crim. App. Rule 10(b). Appellant has made a lengthy argument with no citations to supporting authorities and has also failed to include the standard of review as required by Rule 27. He is, therefore, without relief as to this issue.

## CONCLUSION

Based on the argument of the parties, the record, and the applicable law, we affirm the judgments of the trial court. We remand for correction of the clerical error noted *supra*, footnote 3.

_____
ROGER A. PAGE, JUDGE